IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| TRACY MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | CASE NO. CV 04-476-S-MHW |
| WINCO HOLDINGS, INC., an Idaho | ) | |
| corporation, | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>INTRODUCTION</u>

Plaintiff Tracy Miller ("Miller") filed this action against Defendant WinCo Holdings,

Inc. (WinCo) in the District Court of the Fourth Judicial District of the State of Idaho, in and for

the County of Ada, alleging violations of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101, *et seq.* and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § § 2601-

2654, as well as various state law claims including breach of the covenant of good faith and fair

dealing, intentional and negligent infliction of emotional distress, and wrongful termination.  On

August 20, 2004, Miller filed an Amended Complaint in state court.  Winco removed this matter

**Memorandum Decision and Order - Page 1**

to federal court on September 20, 2004.  Subsequently, on October 20, 2005, WinCo filed this

Motion for Summary Judgment (Docket No. 28), which is currently pending before the Court.

On May 8, 2006, the Court conducted a hearing with counsel for both parties present.

The Court will grant WinCo's Motion for Summary Judgment for the reasons sets forth below.

# I.
## Background

In approximately April 2000, Plaintiff Tracy Miller began her employment with WinCo

and worked there until her termination in February 2004.  Miller has been diagnosed with

fibromyalgia, rheumatoid arthritis, osteoarthritis, asthma, carpal tunnel syndrome in both wrists,

and a chemical imbalance.  Miller maintains that she suffers from chronic fatigue, as wells as

muscle twitches and pain, and has difficulty standing and walking for extended periods in relation

to the above illnesses.

Miller suffered these conditions during her employment at WinCo, and in May 2003,

WinCo approved Miller for intermittent FMLA relating to her fibromyalgia and a possible

diagnosis of rheumatoid arthritis.  When Miller was approved for FMLA, WinCo notified her that

she would still be required to follow WinCo's attendance policy, which included notifying store

management that she would be unable to work at least two hours prior to the beginning of a

scheduled shift.  When notifying store management, Miller was required to specify whether the

absence related to her FMLA approved condition and provide a doctor's note for each absence

relating to her condition.  If the absence was FMLA related, WinCo would not mark the absence

against Miller as required under the FMLA.

Conversely, under WinCo's general attendance policy, an employee accrues a designated

number of attendance points for each absence, incomplete shift, or tardiness – including any

absence caused by an illness not covered by the FMLA.  Specifically, an employee's absence results in the assignment of 3 points against the employee while an incomplete shift or a tardy results in the assignment of 2 points.  If an employee is absent for successive days relating to the same non-FMLA illness, the employee is only marked once.  An employee's accumulation of 9 or more points in any 3-month period, or 15 or more points in any 12-month periods constitutes excessive absenteeism under WinCo's attendance policy and subjects the employee to progressive discipline.  Miller acknowledged in writing on different occasions that she knew this policy, understood it, and agreed to comply with it – although she disagreed with it.[1]

Prior to being approved for FMLA intermittent leave, Miller was warned for excessive absenteeism on two separate occasions.  Specifically, on January 2, 2002, WinCo verbally warned Miller for being "late or absent on 8 different occasions from 9/06/01 to 12/29/01."  *(Id.* at Ex. 24.)  On October 4, 2002, WinCo warned Miller in writing because she had accumulated 20 attendance points between March 6 and September 30, 2002.  After the second occurrence, WinCo advised Miller that she should seek FMLA approval for intermittent leave relating to her chronic conditions.

While Miller did gain approval for intermittent FMLA leave for her fibromyalgia in May 2003, WinCo suspended Miller on December 5, 2003 when she failed to timely notify her manager at WinCo that she would not be showing for her regularly scheduled shift on account of a non-FMLA condition in violation of its No Show/No Call Policy.[2]  At the time of her

---

[1] Miller stated in her deposition that she believed WinCo should have a more lenient attendance policy that would differentiate between an absence resulting from an illness and absence where the employee simply chooses not to go to work, rather than the no-fault policy that WinCo does follow. (Miller Depo. at 113-114.)

[2] Apparently, Miller dropped her son off at school the morning that she was cited for violating the No Call/No Show policy, returned home and fell asleep.  She received a call from her manager at 2:30 p.m., which woke

**Memorandum Decision and Order - Page 3**

suspension, WinCo admonished Miller in writing that she would be discharged if she violated

WinCo policy on any other occasion.

Prior to her suspension in December 2003, WinCo also progressively disciplined Miller

for mishandling company funds.  On January 15, 2003, WinCo verbally warned Miller for

allowing a customer to leave without paying $77.85.  A few months later, on April 9, 2003,

WinCo warned Miller in writing for her till being short on two separate days.  And finally on July

8, 2003, WinCo suspended Miller for three days for her failure to collect $132.74 from a

customer.  Miller appealed her suspension with a WinCo grievance committee composed of other

hourly employees.  The grievance committee approved her suspension despite Miller's concerns

regarding the overall policy.

Due to a series of non-FMLA related absences, Miller continued to accrue attendance

points and WinCo eventually discharged Miller on February 20, 2004 for these violations.  At the

time of her discharge, WinCo's attendance records for Miller in 2003 and 2004 indicate that

Miller had accrued 18 points in the prior 3-month period from November 2003 through January

2004 (9 being the maximum that could be accrued) and 32 points in the prior 12-month period

from April 2003 through January 2004 (15 being the maximum that could be accrued), which

clearly violated WinCo's policy.  Miller acknowledged she violated the policy but expressed her

general dismay at the policy in general.

Before her termination, Miller asked WinCo for various accommodations relating to her

medical conditions, and WinCo granted her requests.  Specifically, it reduced her shift hours,

---

her up, because she was supposed to work at 2:00 p.m.  After she was awakened, Miller got ready for work and went
to work at 3:15 p.m. – an hour and fifteen minutes late.  (Miller Depo. at 103-105.)  In her deposition, Miller
attributed the incident to her chronic fatigue, stating "[s]o I think I was sick or something, chronic fatigue set in or
something." (*Id.* at 104)

**Memorandum Decision and Order - Page 4**

permitted her to use a stool while working, and extended her lunch hour.   Miller also requested to be transferred from her position as a checker to another position in the store, for which she could move around more and not have to remaining standing in one place for eight-hours.   Miller alleges her manager, Mr. Bruce Gilchrist, was reluctant to grant this request.   Miller went to corporate headquarters and requested the transfer and she was allowed to move to the deli department.

Miller had two problems while working in the deli department.   First, she found it too physically strenuous.   Instead, she wanted to work in a position that would have allowed her to move, but where she would not have to work at such a fast pace.   Miller also had a problem with some of her deli co-workers, who she claims were harassing her on account of her disability.   On the advice of her manager, Miller began writing specific instances of her co-worker's conduct in a notebook.   Between December 2003 and the time of her termination in February 2004, Miller recorded six instances of allegedly harassing conduct.   Miller also testified that prior to her recordation of these six events, approximately four other instances of alleged harassment occurred, bringing the total to ten instances.

Some examples of her entries regarding her dispute with her co-workers are as follows:

I went on break, but was stopped by a customer who needed help.  I helped him, but it took a few minutes.  I stopped by the Deli to tell them I was helping a customer and have [sic] not yet had my break.

Dawn said[,] "you've been gone a long time already."  When I tried to say something about still getting a break, she said[,] "What, you want another break." I said[,] I didn't get a break."  She said[,] "you can't help a customer that long and still take a break."

Witness – Delia.  Offensive – I still should have a break, especially when doctor ordered.  Customers come first.

(Miller Depo., Ex. 35, pp. Miller I(1-2).)

> I was left with all the fryer stuff, and I mean <u>all</u> of it.  The 6:00 person (Dawn) was supposed to skewer the chickens and clean the rotissaire [sic] oven.  I was not done.  The 8:00 person (Cyndy) was supposed to do backed-up [sic] baked chicken and clean one fryer.  Baked chicken was done by Dawn.  The fryer was not done at all.  I was stuck doing the oven, skewering chickens, cleaning and changing oil in both fryers, fry carts and sinks.  I am not their slave.

(*Id.* at Miller N(4-5).  Another entry was clearly related to her illness wherein Miller noted her fellow employee stated "to [her] face" that she could not perform her job with her "disease." (*Id.* at Miller H(1).  Miller complained to Ms. Davis with human resources and the matter was investigated and  the employees were apparently given a verbal warning.  It is unclear whether the situation improved because Miller was discharged in February 2004.

After her termination, Miller filed a complaint with the Equal Employment Opportunities Commission, which issued a Dismissal and Notice of Right to Sue to Miller on May 12, 2004.

## II.
## Standard of Review

When reviewing a motion for summary judgment, the proper inquiry is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (1993).  A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the moving party meets the requirement of Rule 56 by showing either that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's

case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  It is not enough for the [non-moving] party to "rest on mere allegations of denials of his pleadings." *Id.*  Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Id.* at 250.

"When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability."  *Id.* at 249-250. "The mere existence of a scintilla of evidence in support of the [defendant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [defendants]." *Id.*

The Ninth Circuit has consistently applied the standard for granting summary judgment. *Musick v. Burke*, 913 F.2d 1390 (9th Cir. 1990); *Pelletier v. Federal Home Loan Bank*, 968 F.2d 865 (9th Cir. 1992); *Bieghler v. Kleppe*, 633 F.2d 531 (9th Cir. 1980).

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party.  To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law. *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 591 (9th. Cir. 1981).

The Ninth Circuit has recently emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992).

In order to withstand a motion for summary judgment, the non-moving party:

(1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371 (9th Cir. 1989).

**III.**
**Discussion**

**A. Federal Claims**

**1. Miller's Claim of Disability Discrimination under the ADA**

The Americans with Disability Act (ADA) prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual. . . ." 42 U.S.C. § 12112(a).  The Act specifically delineates which phases in the employment process are protected: "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.*

Miller alleges she was terminated because of her disability.  Therefore, in order to establish a prima facie case under the ADA, a plaintiff must show: (1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability. *See Snead v. Metropolitan Property & Cas. Ins. Co.*, 237 F.3d 1080, (9th Cir. 2001).

**a. Whether Miller's condition(s) constitute a "disability" under the ADA**

The first element of Miller's prima facie case concerns whether she is a "disabled" person as that term is defined in the ADA. See 42 U.S.C. § 12102.  Under the ADA, a "disabled person" is defined as a person who: (1) "has a physical or mental impairment which substantially limits one or more major life activities;" (2) "has a record of such an impairment;" or (3 ) "is regarded as having such an impairment." 42 U.S.C. § 12102(2).  Further guidance is found in the Code of Federal Regulations, 29 C.F.R. § 1630.2, which provides, in pertinent part, that major life activities include functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working, while the term substantially limits means:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.
> 29 C.F.R. § 1630.2(j)(1).

Moreover, the federal regulations set forth the following factors to be considered in determining whether an individual is substantially limited from engaging in a major life activity:

> (i) The nature and severity of the impairment;
>
> (ii) The duration or expected duration of the impairment; and
>
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

Miller has been diagnosed with fibromyalgia, rheumatoid arthritis, osteoarthritis, asthma, carpal tunnel syndrome in both wrists, and a chemical imbalance.  Miller alleges her medical

conditions substantially limit the major life activities of walking, standing, lifting, and carrying.  In her opposition brief, Miller also alleges her condition substantially limits her ability to work and perform manual tasks.

WinCo does not seriously dispute that Miller may suffer from a physical impairment but argue she has failed to establish a question of material fact as to whether the purported physical impairments substantially impair a major life activity  Although Miller testified that she suffers from chronic fatigue, as wells as muscle twitches and pain, and has difficulty standing for extended periods, WinCo points out that Miller also stated that she agreed with Dr. Erland's assessment that none of her impairments limited a major life function.  (Miller Depo. at 167.)

With respect to the first alternative definition of "disability," the Court finds that although Miller has shown that she does suffer from a physical impairment as a result of her various medical conditions, Miller has nonetheless failed to establish that her condition "substantially limits one or more of [her] major life activities." 42 U.S.C. § 12102(2).  Miller has simply not demonstrated any major life activity that has been significantly impacted.  Miller's own deposition testimony supports this conclusion.  While Miller did testify that she hurts when she walks and that, on occasion, the involuntary muscle twitches cause her to drop things, she further stated in response to the question whether her condition impacts her ability to perform her normal daily functions, "Most of the time no . . . You function with it.  You do what you need [to] do, but you are not living your life as full and as well as you would like to if you didn't have this disorder."  (Miller Depo. at 38, 40.)

Miller further noted that her condition did not prohibit her from taking care of herself and that she could walk and stand, although she did begin to ache if she had to walk or stand for extended periods.  Although the Ninth Circuit has not defined what constitutes a substantial

limitation on a person's ability to walk within the meaning of the ADA, other circuits have

addressed the issue, and have concluded that moderate pain and discomfort do not sufficiently limit

a person's ability to walk. *See, e.g., Penny v. United Parcel Serv.*, 128 F.3d 408 (6th Cir.

1997)(holding that moderate difficulty or pain experienced while walking does not rise to the level

of a disability despite plaintiff having testified that he limped occasionally, that it hurt to do his job

every day, and that it hurt to walk, and having provided medical statements from plaintiff's three

treating doctors); *Penchishen v. Stroh Brewery Co.,* 932 F.Supp. 671 (E.D.Pa. 1996), *aff'd*,116 F.3d

469 (3rd Cir. 1997) (Table), *cert. denied*, 522 U.S. 868 (1997)(finding that a plaintiff who could

walk at only one-half her normal speed following an automobile accident was not substantially

limited in the major life activity of walking).

　　　　Furthermore, Miller's own statements that she agreed with Dr. Erland's statements that she

was able to perform all the physical requirements of her job belie her allegations that she is

substantially limited in her ability to work.[3]  In fact, at the time of her deposition, Miller was

working for Maverick and to the Court's knowledge, continues to work at Maverick.  As for her

allegations in her Amended Complaint that she is impaired in her ability to carry and lift objects,

---

[3]The Supreme Court has assumed that working may be a "major life activity" for purposes of the ADA, but "only '[i]f an individual is not substantially limited with respect to any other major life activity.' " *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492,(1999); *citing* 29 CFR § 1630.2(j) (emphasis in original); *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 200 (2002).

　　　　The Regulations define "substantially limited " With respect to the major life activity of working as follows:

> (i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)

Miller has not presented any evidence to substantiate these limitations and does not mention them in her Opposition to Defendant's Motion for Summary Judgment.

Miller's recitation of the law and conclusory statements that her conditions did in fact substantially limit her ability to walk, stand, work, and perform manual tasks do not suffice to rebut evidence provided by her treating physician that Miller's condition did not limit her major life activities and Miller's own deposition testimony to this effect. With respect to the other two prongs, Miller does not seem to argue either that she has a record of such an impairment[4] or was regarded as having such an impairment.[5] Nor does the Court find any basis for such a finding. As Miller has failed to raise a question of material fact as to whether her impairments substantially limit a major life activity, the Court need not consider whether Miller could perform the essential functions of her job, with or without accommodation, or whether WinCo in fact reasonably accommodated Miller. Accordingly, the Court will grant summary judgment in favor of WinCo on Miller's discrimination claim under the ADA.

### 2. Retaliation

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual

---

[4]In order to prove that her record of impairment amounts to a disability within the meaning of the ADA, Miller must show that she "has a history of, or has been misclassified, as having a mental or physical impairment that substantially limits one or more major life activities."29 C.F.R. § 1630.2(k). In other words, "the documentary record must indicate that the plaintiff has the same kind of disability that satisfies the 'actually disabled' definition: an impairment that substantially limits one or more of an individual's major life activities."

[5]In order to satisfy this definition of disability plaintiff must show that even if he is not disabled, defendant perceived him to be disabled and treated him accordingly. See29 C.F.R. § 1630.2(1)(3). " 'As with real impairments, AAAa perceived impairment must be substantially limiting and significant." *Thompson v. Holy Family Hosp.*, 121 F.3d 537, 541 (9th Cir. 1997)(*quoting Gordon v. E.L. Hamm & Assocs.*, 100 F.3d 907, 913 (11th Cir.1996)). The relevant inquiry is whether the impairment, as perceived by defendant, would affect the plaintiff's ability to work a broad class of jobs. *See Muller v. Automobile Club*, 897 F.Supp. 1289, 1297-98 (S.D.Cal.1995).

**Memorandum Decision and Order - Page 12**

made a charge ʌʌʌunder [the ADA]."42 U.S.C. § 12203(a).  Retaliation claims are treated the same whether brought under the ADA or Title VII. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).

### a. Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in protected activity; (2) that she suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action.  If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action. The plaintiff, of course, bears the ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination.

In her Amended Complaint, Miller alleges that WinCo retaliated against her for engaging in activity protected under the ADA and "[t]he retaliation manifested itself in a continuous and ongoing effort to intimidate, harasses, and punish [her] culminating in termination. (Amended Complaint ¶ 34.)   Miller further alleges that "following and because she filed her complaint [WinCo] allowed the harassment to continue, singled her out for closer scrutiny for disciplinary action, and assigned her for less desirable duties in the deli," and because Miller filed her administrative complaints, WinCo terminated her employment.  *Id.* at 35-6.

### b. Protected Activity

WinCo contends the alleged conduct Miller has opposed does not "fairly fall within the protection of" the ADA, therefore, Plaintiff cannot state a claim for retaliation. *See Learned v. City of Bellevue,* 860 F.2d 928, 932 (9th Cir.1988)(holding in the context of Title VII, "the opposed

conduct must fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation."); *Henry v. Guest Services, Inc.*, 902 F.Supp. 245, 251 (D.D.C.1995) (holding that an employee must show "that he or she engaged in activity protected by the statute" to establish a prima facie case of retaliation).

For Miller to have a claim for retaliation, she must have suffered retaliation for opposing an act or practice made unlawful under the ADA. 42 U.S.C. § 12203(a).  "The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978); *accord Little v. United Technologies, Carrier Transicold Div.*, 103 F.2d 956, 959 (11th Cir. 1997).  However, a retaliation claim may be premised on a discriminatory act by a co-worker whose actions can be imputed to the employer through any agency theory. *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013-14 (9th Cir 1983).  In addition, if the employee shows that the employer knew or in the exercise of reasonable care should have known of harassment creating a hostile work environment and did not take prompt remedial action, then the employer may have engaged in an unlawful employment practice and could be liable for the actions of the employee's co-workers. *Follkerson v. Circus Circus Enter., Inc.*, 107 F3d 754, 755-56 (9th Cir. 1997).   Further, an employer may be liable for harassment by a private individual (and presumably co-workers) "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Id.* at 756.

In addition, the Ninth Circuit allows a plaintiff to bring a retaliation claim under the ADA if she reasonably believes that the underlying discrimination is actionable even if it eventually is not. *Trent v. Valley Elec. Ass'n, Inc.*, 41 F3d 524, 526 (9th Cir. 1994); *Crown Zellerbach*, 720 F.2d at

**Memorandum Decision and Order - Page 14**

1013.  In *Moyo v. Gomez*, 40 F3d 982, 985 (9th Cir. 1994), *cert denied*, 513 U.S. 1081 (1995), the

court defined the "reasonable belief" test for retaliation in the context as Title VII – which applies

equally to a claim under the ADA – as follows:

> The reasonableness of [a plaintiff's] belief that an unlawful employment practice
> occurred must be assessed according to an objective standard-one that makes due
> allowance, moreover, for the limited knowledge possessed by most Title VII
> plaintiffs about the factual and legal bases of their claims. We note again that a
> reasonable mistake may be one of fact or law. We also note that it has been long
> established that Title VII, as remedial legislation, is construed broadly. This
> directive applies to the reasonableness of a plaintiff's belief that a violation
> occurred, as well as to other matters.

As discussed above, Miller has not provided sufficient evidence to prove that WinCo

discriminated against her because of her alleged disability.  However, Miller may nonetheless

prevail on her retaliation claim if she had a reasonable belief that she was opposing prohibited

conduct when she reported her co-workers' allegedly harassing comments to management.  Thus,

this Court need not decide whether Miller opposed an actual discriminatory practice by WinCo.

Miller does not specify to what specific "administrative complaints" she refers when she

states in her Amended Complaint that she engaged in protected activity "when she filed

administrative complaints of harassment due to her disability."  Nor does she elucidate this point

in her brief as she never discusses her retaliation claim in her Opposition to Defendant's Motion

for Summary Judgment.  Miller's attorney seemed to suggest at the hearing that Miller

complained formally to WinCo's corporate office, but the Court could not find any evidence of

any formal "administrative complaints" made by Miller in the record.

Without further clarification from Miller, WinCo characterizes Miller's supposed

"administrative complaints" as her verbal complaints about her deli co-workers to her supervisor

and the director of human resources.  Based on this characterization of Miller's complaints,

Winco argues that such informal complaints cannot constitute protected activity.  The Court

disagrees.  It is true that the filing of a discrimination complaint with the Equal Employment

Opportunity Council (EEOC), state agencies, or the Department administration easily satisfies

this requirement.  Yet, protected activity also can include the informal expression of opposition to

alleged harassment because of a plaintiff's disability, such as verbal complaints to a supervisor.

*See EEOC v. Hacienda Hotel*, 881 F.2d 1504 (9th Cir. 1989) (finding protected activity where

employee complained to the general manager of a hotel about her supervisor's refusal to adjust

her schedule to accommodate her religious practices).  Miller must have notified her supervisors,

however, that her opposition to the employer's practices was based on grounds of discrimination

and not merely a personality conflict or a professional dispute. *See Jurado v. Eleven-Fifty Corp.*,

813 F.2d 1406, 1411-12 (9th Cir. 1987).

In *Jurado*, the plaintiff, a radio disc jockey bilingual in both Spanish and English, claimed

he was fired in retaliation for opposing a station order mandating him to speak only English while

on the air.  While the Court held that the English-only rule was not discriminatory because the

rule was motivated by the market, rather than racial considerations, it noted the plaintiff could

still support a claim for retaliation if he reasonably believed that he was opposing a

discriminatory business practice when he objected to the rule.  Although the plaintiff had

complained to his manager about the English-only order, suggesting that his success at the radio

station "was attributed to the Hispanics and that ethnic flavor," the *Jurado* court found that the

plaintiff failed to produce any evidence that he engaged in a protected activity because has not

shown that he ever opposed the format change as discriminatory before he was fired.  *Id.* at 1411-

1412.  In reaching this conclusion, the court reasoned that the plaintiff's comment to his manager

did not demonstrate any concern about discrimination against the plaintiff or other Hispanics. Instead, the court found, "[the plaintiff] merely opposed the change for personal reasons – he wanted to preserve the value of his radio personality."  Based on this finding, the court concluded the district court correctly granted summary judgment in favor of the defendant.  *Id.* at 1412.

In this case, we do not know what Miller told her supervisors regarding her co-worker's comments because she has not submitted any evidence regarding what conduct she considers to be a protected activity.  Although some of Miller's statements in her deposition indicate she believed at the time of her testimony that she had been harassed by her co-workers because of her medical conditions, without any evidence submitted by Miller that she told her supervisors something to this effect, it is difficult for the Court to conclude that Miller engaged in an activity protected under the ADA.  In fact, Miller's deposition testimony regarding the purported harassment suggests her co-worker's comments were primarily limited to rude remarks unrelated to her medical condition.  Miller states that certain deli workers were not only rude to her, but also to "some of the other girls in the deli" who presumably did not suffer from any disabilities. (Miller Depo. at 216.)  Miller made it abundantly clear that she thought her co-workers' comments were "rude and nasty."  However, it is not clear that Miller reasonably believed she was engaging in a protected activity when she complained of the comments, the majority of which were not even related to her medical condition, to one or more of her supervisors.

### c. Causal Link

Although the Court can find no evidence in the record that Miller engaged in a protected activity, assuming, arguendo, she did engage in a protected activity and that she suffered an adverse employment action, i.e., termination, Miller has clearly failed to establish a causal link

between any protected activity and her termination.  Causation sufficient to establish the third

element of the prima facie case may be inferred from circumstantial evidence, such as the

employer's knowledge that the plaintiff engaged in protected activities and the proximity in time

between the protected action and the allegedly retaliatory employment decision." *Yartzoff v.*

*Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987).

Although the time between when Miller began documenting her co-workers' remarks  in

December 30, 2003 and her eventual termination in February 2004 is relatively short, Miller has

not produced any evidence that Mr. Gilchrist, who made the decision to terminate Miller on

account of her excessive absenteeism, was even aware of Miller's complaints against the other

deli workers.  Actual knowledge of the protected activity by the supervisor responsible for the

adverse employment action is an essential part of a retaliation claim. *Yartzoff*, 809 F.2d at 1376.

Because there is insufficient evidence that Mr. Gilchrist even knew about Miller's complaints

against her co-workers, or if he did, if he knew Miller believed the harassment was related to her

purported disability, Miller has failed to sustain her burden as to the third prong of her prima facie

case.

However, even if Miller could make out a prima facie case of retaliation, WinCo would

still be entitled to summary judgment on the ground that Miller has offered no evidence to

overcome its proffered legitimate business reason for her termination, and as a result, Miller fails

to satisfy her burden in this regard.  Presented with Miller's unsupported allegations of retaliation

and WinCo's well-documented history of attendance problems, no reasonable jury could conclude

that WinCo mistreated or fired Miller in retaliation for her complaints against the deli workers.

**Memorandum Decision and Order - Page 18**

### 3. FMLA

Congress enacted the FMLA in response to growing concerns about inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods.  *Scamihorn v. General Truck Drivers*, 282 F.3d 1078, 1082 (9th Cir. 2002). Indeed, it is an expressed purpose of the statute to "entitle employees to take reasonable leave for medical reasons ... in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(2)-(3); *see also Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1120 (9th Cir. 2001)(describing the purpose of the FMLA to "balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions").  The FMLA does not replace traditional employer-established sick and personal leave policies; rather, it provides leave for uncommon and often stressful events such as caring for a family member with a serious health condition.  *See e.g., Scamihorn*, 282 F.3d at 1082.

To effect this purpose, the FMLA guarantees an "eligible employee" twelve work weeks of leave each year "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  The FMLA further provides that the taking of such leave "shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." *Id*. § 2614(a)(2).  An employee may sue to recover damages or equitable relief when her employer "interfere[s] with, restrain[s], or den[ies] the exercise or attempt to exercise" the rights guaranteed by the statute. Id. §§ 2615(a)(1), 2617(a)(2).

Miller argues that WinCo impermissibly considered her legitimate FMLA intermittent leave when discharging her.  The FMLA's prohibition against an employer interfering with,

restraining, or denying the exercise of or the attempt to exercise any right provided by the FMLA encompasses an employer's consideration of an employee's use of FMLA-covered leave in making adverse employment decisions.

However, the evidence does not show that WinCo improperly considered non-FMLA related absences in makings its decision to terminate her.  During her deposition, Miller admitted that she had accumulated more attendance points than allowed pursuant to WinCo's attendance policy.  Miller had accrued 18 points in the three months prior to her termination when under the policy she was only allowed nine in a three-month period before she could be subjected to progressive discipline, and she had accrued 32 points in the twelve months prior her termination when the policy only allowed 15 before she could be subjected to progressive discipline.  Thus, Miller had far exceeded the points allowed under the attendance policy.  She had also been warned both verbally and writing on different occasions about her excessive absenteeism and had been suspended for violating the No Call/No Show policy.  At the time of her suspension, Miller was warned that any further violation of WinCo's policy would result in the termination of her employment.

Furthermore, Miller acknowledged in her deposition, with the exception of the January 11, 2004 absence, that WinCo had properly characterized those absences for which she accrued points as non-FMLA related.  In her Opposition to Defendant's Motion for Summary Judgment, Miller attempts to raise a genuine issue of fact as to whether or not the November 7, 9, 16, and December 5, 2003 absences for colitis and chronic fatigue were covered conditions.  However, at the time of these absences – assuming the absences would have been covered by the FMLA, which is doubtful – Miller had a duty to inform WinCo that the absences were FMLA-related. 29

C.F.R. § 825.303(a)(When an FMLA absence is unforeseeable, notice is expected to be given within no more than one or two working days of learning of the need for leave, except for emergency situations where notice may be given as soon as practicable.)  An employer is not required to grant FMLA leave in the absence of a request for such leave, *see, e.g., Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706 (7th Cir. 2002), even assuming an employer has sufficient notice that the employee suffered from a FMLA-covered health condition. *Brenneman v. MedCentral Health System*, 366 F.3d 412 (6th Cir. 2004).  Miller's history of absenteeism and her prior knowledge and use of both the FMLA's and WinCo's rules and procedures concerning leave and absenteeism further support the conclusion that she should have requested FMLA leave at the time those absences occurred.  *See Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 978 (5th Cir. 1998)("Satterfield's employment history and her knowledge as well as utilization of Wal-Mart's rules and procedures concerning leave and absenteeism provide a backdrop for determining whether she gave sufficient FMLA-notice.")  Miller may not retroactively assert during litigation that WinCo improperly counted these absences against her when they had no prior notice that Miller would later contend these absences should be covered by FMLA.[6]

Miller also alludes to the possibility that WinCo's policies exceeded the requirements of the FMLA.  Specifically, Miller argues that the FMLA would not permit employers to deny otherwise qualifying FMLA leave simply because an employee fails to follow a company's internal notice requirements.  Although the regulations do specifically contemplate the establishment of notice policies by individual employers, the Court agrees that the FMLA does

---

[6] Of course, it would have been difficult for Miller to notify WinCo at that time that she was taking FMLA leave as she admitted in her deposition that she did not believe these absences were FMLA-related.  It should also be noted that even omitting the disputed absences, Miller's points would still have exceeded the amount allowed under WinCo's attendance policy, thereby subjecting Miller to progressive discipline and possible termination.

not permit an employer to limit his employee's FMLA rights by denying them whenever an employee fails to comply with internal procedural requirements that are more strict than those contemplated by the FMLA.  However, Miller does not provide any evidence to substantiate this claim and she cannot create a genuine issue of material fact by simply making a bald assertion in her response brief.

### B. State Law Claims

### 1. Intentional/Negligent Infliction of Emotional Distress

Miller makes a claim for intentional infliction of emotional distress, averring that she experienced increased stress and pain as a result of WinCo's "extreme and outrageous conduct." A claim for intentional infliction of emotional distress will lie only when there has been extreme and outrageous conduct by the defendant and resultant severe emotional distress suffered by the plaintiff.  *Payne v. Wallace*, 136 Idaho 303, 306, 32 P.3d 695 (Ct. App. 2001).  In order to state a claim for intentional infliction of emotional distress, Miller must show that: (1) WinCo's conduct was intentional or reckless; (2) the conduct was extreme or outrageous; (3) there was a causal connection between the wrongful conduct and her emotional distress; and (4) the emotional distress was severe. *Id.*

Justification for an award of damages for emotional distress seems to lie, not in whether distress was actually suffered by a plaintiff, but rather the quantum of outrageousness of the defendant's conduct.  *Edmondson v. Shearer Lumber Products,* 139 Idaho 172, 179; *Brown v. Fritz*, 108 Idaho 357, 362.  Although a plaintiff may in fact have suffered extreme emotional distress, no damages are awarded in the absence of extreme and outrageous conduct by a defendant.  *Edmondson*, 139 Idaho at 179.  Even if a defendant's conduct is unjustifiable, it must

necessarily rise to the level of atrocious and beyond all possible bounds of decency that would cause an average member of the community to believe it was outrageous to support a claim for intentional infliction of emotional distress.  *Id.*

The Court finds that Miller's claim for intentional infliction of emotional distress fails as a matter of law because she has failed to meet the standard for demonstrating that WinCo's conduct was extreme and outrageous.  She offers no facts that demonstrate WinCo's conduct rises to the level of atrocious and beyond all possible bounds of decency such that an average member of the community would believe it was outrageous.  Because the Court does not find that WinCo wrongfully discriminated against Miller and did not violate her FMLA rights when it terminated her, this conduct cannot serve as a basis for a claim for intentional infliction of emotional distress.

Miller also references harassing and humiliating conduct on the part of WinCo, but does not specify to which conduct she refers.  The only "harassing" behavior on the part of WinCo employees that the Court can glean from the record is the alleged refusal by her store manager, Mr. Bruce Gilchrist to transfer her and a few "snotty" remarks made by fellow deli workers. However, the record indicates that Miller was moved to the deli two weeks after her request to be transferred – the Court does not perceive this as undue delay considering Mr. Gilchrist had to take into account the store's needs, as well as the needs of the other WinCo employees before he could transfer Miller to another department.  As for the allegedly harassing statements by Miller's co-workers, the Court does not find the comments reached the atrocious level and beyond all possible bounds of decency.

**2. Negligent Infliction of Emotional Distress**

Miller has also alleged a cause of action for negligent infliction of emotional distress.  In order to recover damages for negligent infliction of emotional distress, the law requires that emotional distress be accompanied by physical injury or physical manifestations of injury. The physical injury requirement is designed to provide some guarantee of the genuineness of the claim to alleviate the danger that claims of mental harm will be falsified or imagined.  *Brown v. Matthews Mortuary, Inc.,* 118 Idaho 830, 801 P.2d 37 (Idaho 1990); *Czaplicki v. Gooding School District No. 231*, 116 Idaho 326, 775 P.2d 640 (1989).

There must be evidence, however, that the claimed physical injury was caused by the incident. *Evans v. Twin Falls County*, 118 Idaho 210, 796 P.2d 87 (1990).  In the instant case, Miller does not set forth any particular physical manifestations of the emotional distress in her Amended Complaint. (*See* Amended Complaint ¶ ¶ 48-9.).  In her deposition, Miller alleged the increased stress from work aggravated her fibromyalgia and rheumatoid arthritis.  In addition, she asserted as a result of the purportedly harassing conduct she suffered at work, she "was very upset," "was snapping at everybody," and "was very stressed."  There is no specific evidence as to the physical manifestations suffered by Miller.  Furthermore, the only evidence in the record is that the aggravation of her medical conditions was presumably related to the stress from work, which does not establish that the physical problems were actually caused by WinCo's actions.

Miller has failed to come forward with evidence to show a genuine issue of material fact regarding physical manifestations of his emotional distress caused by WinCo's actions. Therefore, summary judgement must be granted in favor of WinCo with respect to this claim as well.

### 3. Breach of implied covenant of good faith and public policy

In Idaho, "any action by either party which violates, nullifies or significantly impairs any benefit of the employment contract is a violation of the implied-in-law covenant of good faith and fair dealing." *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 628, 778 P.2d 744 (1989). Miller alleges that WinCo promised her "progressive discipline procedure" prior to termination of employment and that WinCo terminated her without the benefit of progressive discipline. The evidence, however, does not support Miller's assertion. Miller received several warnings –verbal and written – before her termination, was suspended twice before her termination, and with the last suspension was warned she would be terminated if she violated WinCo policy on another occasion. The various warnings would seem to satisfy WinCo's own progressive discipline policy. As such, the Court does not find that Miller has presented sufficient evidence to support a claim for a breach of an implied covenant in the employment relationship. Therefore, her claim must be dismissed.

### 4. Wrongful Termination

An employee may claim damages for wrongful discharge when the motivation for firing the employee contravenes public policy. *Jackson v. Minidoka Irrigation Dist.*, 98 Idaho 330, 333, 563 P.2d 54, 57 (1997). The purpose of the exception is to balance the competing interests of society, the employer, and the employee in light of modern business experience. *Crea v. FMC Corp.,* 135 Idaho 175, 178, 16 P.3d 272, 275 (2000). The public policy exception has been held to protect employees who refused to commit unlawful acts, who perform important public obligations, or who exercise certain legal rights or privileges. *Sorensen v. Comm Tek, Inc.,* 118 Idaho 664, 668, 799 P.2d 70, 74 (1990). Public policy of the state is found in the constitution and

statutes.  *Boise-Payette Lumber Co. v. Challis Independent School Distr.  No. 1,* 46 Idaho 403, 268 P.26 (1928).

Specifically, Miller argues WinCo's decision to terminate her contravenes public policy because it made the decision in retaliation for Miller making complaints of harassment relating to her medical conditions.  The same reasoning which precludes a finding in favor of Miller with respect to her retaliation claim, also precludes her claim for wrongful discharge.  As the Court granted WinCo's motion with respect to retaliation, the Court will grant WinCo's motion with respect wrongful termination.

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that** Defendant's Motion for Summary Judgment (Docket No. 28), filed on October 20, 2005, is GRANTED.



DATED: May 22, 2006

_____
Honorable Mikel H. Williams
United States Magistrate Judge

**Memorandum Decision and Order - Page 26**